IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) WAYNE BROWN,<br><br>        Plaintiff,<br><br>   v.<br><br>(1) CITY OF TULSA; and (2) CHARLES W. JORDAN, individually and in his official capacity as Chief of Police, Tulsa Police Department;<br><br>        Defendants. | Case No. 19-cv-00538-JED-FHM<br><br>**COMPLAINT**<br>[Civil Rights Action, 42 U.S.C. § 1983]<br><br>Demand for Jury Trial |

Plaintiff Wayne Brown, by and through his undersigned counsel, brings this Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof alleges the following upon information and belief:

## INTRODUCTION

1. This case seeks to protect and vindicate fundamental constitutional rights. It is a civil rights action brought under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983, challenging Defendants' termination of Plaintiff on account of the content and viewpoint of his speech, which was made as a private citizen commenting upon matters of public concern.

2. On or about September 4, 2019, Defendants, acting under color of state law, terminated Plaintiff's employment as a police officer with the City of Tulsa Police Department (hereinafter "TPD") because of the content and viewpoint of certain social media posts allegedly made by Plaintiff several years prior to the City hiring him as a police officer.

3. "It is well settled that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Garcetti v. Ceballos*, 547 U.S. 410, 413 (2006) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983));

*Rankin v. McPherson*, 483 U.S. 378, 383 (1987) ("[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech."); *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (same).

4.      Plaintiff seeks a declaration that Defendants violated his clearly established constitutional rights as set forth in this Complaint; a declaration that the termination of Plaintiff's employment as a police officer with the TPD was unlawful; an injunction enjoining the enforcement of Defendants' unconstitutional acts, policies, practices, procedures, and/or customs that were the moving force behind the violation of Plaintiff's constitutional rights as set forth in this Complaint; an injunction expunging all paperwork or references from Plaintiff's personnel file related to the incident giving rise to Defendants' violation of his constitutional rights as set forth in this Complaint and prohibiting the use of any such paperwork or references in any future employment matter; and an award of compensatory and nominal damages.  Plaintiff also seeks an award of his reasonable costs of litigation, including attorney's fees and expenses, pursuant to 42 U.S.C. § 1988 and other applicable law.

## JURISDICTION AND VENUE

5.      This action arises under the Constitution and laws of the United States. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

7.      Plaintiff's claims for compensatory and nominal damages are authorized under 42 U.S.C. § 1983 and by the general legal and equitable powers of this Court.

8.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the

events or omissions giving rise to Plaintiff's claims occurred in this district.

## PLAINTIFF

9.      Plaintiff Wayne Brown is an adult citizen of the United States.  He resides in Claremore, Oklahoma.  Plaintiff is a Christian.

10.     Prior to Defendants' actions giving rise to the constitutional violations set forth in this Complaint, Plaintiff had a stellar reputation as a candidate at the police academy and as a police officer conducting his field training.  Defendants' public firing of Plaintiff has irreparably harmed Plaintiff's reputation.

## DEFENDANTS

11.     Defendant City of Tulsa (hereinafter "City") is a municipal entity organized and existing under the laws of the State of Oklahoma.  The City is a municipal corporation with the right to sue and be sued.

12.     The City, through its officials, including Defendant Jordan, is responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the City and its police department, the TPD, including the policies, practices, procedures, and/or customs that violated Plaintiff's constitutional rights as set forth in this Complaint.

13.     The City approved of and ratified the acts, policies, practices, customs, and/or procedures of its police department and its police officers, including the actions of Defendant Jordan, that deprived Plaintiff of his fundamental constitutional rights as set forth in this Complaint.

14.     Defendant Charles W. "Chuck" Jordan is the Chief of Police for the TPD.  At all relevant times, Defendant Jordan was an agent, servant, and/or employee of the City, acting

under color of state law.  As the Chief of Police, Defendant Jordan is responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the TPD, including the policies, practices, procedures, and/or customs that violated Plaintiff's constitutional rights as set forth in this Complaint.  Defendant Jordan is sued individually and in his official capacity as the Chief of Police.

## STATEMENT OF FACTS

15.    On or about October 24, 2018, Major Ryan Perkins of the TPD informed Plaintiff that he was selected for the Tulsa Police Academy.

16.    It was Plaintiff's life-long dream to become a uniformed police officer.  The news of his selection for the police academy was received with great joy and anticipation.

17.    On or about January 22, 2019, Plaintiff commenced his employment with the TPD.

18.    Prior to and during his time at the police academy, Plaintiff was subject to close scrutiny and background investigations to ensure that he had the character, demeanor, and temperament to become a uniformed police officer, which he does.

19.    At no time has Plaintiff ever discriminated against anyone on account of his or her race, religion, or other protected class. At no time has Plaintiff engaged in any conduct that exhibited an unlawful or otherwise discriminatory bias against any race, religion, or other protected class.

20.    The police academy is twenty-eight weeks long.  It is rigorous, and it is designed, in large part, to test the character of the candidates.

21.    Plaintiff successfully completed the police academy on or about August 2, 2019.

22.     At no time while he was attending the police academy did Plaintiff ever discriminate against anyone on account of his or her race, religion, or other protected class nor did he engage in any conduct that exhibited an unlawful or otherwise discriminatory bias against any race, religion, or other protected class.

23.     At no time while he was attending the police academy did Plaintiff engage in any conduct unbecoming an officer or police employee.

24.     On or about August 6, 2019, Plaintiff began field training with his field training officer, TPD Officer Jim Tornberg.

25.     Plaintiff's shift assignment was Tuesday through Friday, 1400 to 2400 (2 p.m. to midnight).

26.     At no time during his field training did Plaintiff ever discriminate against anyone on account of his or her race, religion, or other protected class nor did he engage in any conduct that exhibited an unlawful or otherwise discriminatory bias against any race, religion, or other protected class.

27.     At no time during his field training did Plaintiff take any action that was inconsistent with his Oath of Office and Value Oath.

28.     At no time during his field training did Plaintiff engage in any conduct unbecoming an officer or police employee.

29.     During his time at the academy and during his field training, Plaintiff's performance as a candidate and his performance as a police officer were exemplary.  Plaintiff's actions demonstrated that he was well qualified to serve as a uniformed police officer with the TPD.

30.     On or about September 4, 2019, Defendants terminated Plaintiff's employment as an officer with the TPD based on the content and viewpoint of social media posts allegedly posted by Plaintiff on his Facebook page ("Duke Brown") several years prior to his hiring by the TPD.

31.     Upon information and belief, Defendants terminated Plaintiff's employment at the urging of Marq Lewis, a local, radical, left-wing, political activist and agitator who has disdain for white police officers and hatred for President Donald Trump, considering both to be racists.

32.     Marq Lewis, and/or those working in association with him, including the Council on American-Islamic Relations-Oklahoma ("CAIR-OK"), made a complaint about Plaintiff's old Facebook posts to Defendants, who fired Plaintiff shortly thereafter as a result.

33.     "Within one hour and fifteen minutes of receiving the complaint the officer was terminated," TPD Sergeant Shane Tuell told reporters, referring to the firing of Plaintiff.

34.     On September 4, 2019, at 8:44 a.m., Marq Lewis posted on his Facebook page the following: "Update: Received confirmation from 2 sources that Duke Brown has been terminated."  "Duke Brown" is Plaintiff.  "Duke" is a nickname he uses.

35.     In his Facebook post, Marq Lewis falsely asserts that "Brown has biases towards people who practice Islam and Black Americans."

36.     In his Facebook post, Marq Lewis complains about three "very offensive social media images" that he and/or those associated with him searched out on Plaintiff's Facebook page.  Marq Lewis describes these images as follows (*typographical errors are in the original*):

"Image of The president riding a lion with the Confederate flag."

"Image of the a fist, acknowledging a fight against the religious faith, Islam."

"Image of the punisher with crosshairs.  The image originated from the American sniper Chris Kyle who was very controversial with killing Iraqi citizens along with killing American citizens during Katrina."

37.     Plaintiff was informed of his termination on September 4, 2019, by TPD Captain Thom Bell, TPD Captain Luke Sherman, and two officers from TPD Internal Affairs.

38.     At approximately 2:05 p.m., Plaintiff was told by Captain Bell to come in the meeting room where Captain Sherman and the Internal Affairs officers were waiting.

39.     Upon Plaintiff's entry into the room, the door was closed behind him by Captain Sherman, and Plaintiff was instructed to remove his gun belt by Captain Bell.

40.     Plaintiff removed his gun belt as ordered and handed it to the Internal Affairs officer to his immediate left, who then laid it on the table.

41.     Plaintiff was told to sit down.  He complied.  He was then handed an Interoffice Correspondence from Defendant Jordan dated September 4, 2019, the subject of which is "Personnel Order #19-257 Termination," and told to read it.  A true and accurate copy of the Interoffice Correspondence is attached to this Complaint as Exhibit A.  Plaintiff read the correspondence, which stated that his employment with the TPD was "hereby terminated effective immediately."

42.     The Interoffice Correspondence made clear that Plaintiff's employment was terminated because the TPD "was made aware of social media postings made by [Plaintiff] that violate Department Rules & Regulations and Policies and Procedures."  *See* Exhibit A.

43.     Accordingly, the basis for Plaintiff's termination was the following TPD policy: Policy and Procedure 31-324 (Social Media and Networking) Procedures C.6., which states, "Department personnel should be mindful that their speech, when using social media, is public

and becomes part of the worldwide electronic domain.  Therefore, adherence to the department's code of conduct is required in the personal use of social media.  In particular, department personnel are prohibited from posting speech containing obscene or sexually explicit language, images, acts, and statements or other forms of speech that ridicule, malign, disparage, or otherwise express bias against any race, religion, or protected class of individuals."  (hereinafter referred to as "Social Media Policy").

44.     However, the Personnel Policies and Procedures for the City state as follows:

402. Prohibition Against Suspension, Removal or Demotion

No person in the classified service shall be suspended, removed or demoted because of race, creed, color, religious or political beliefs or affiliations, except when such person advocates or belongs to an organization which advocates the overthrow of the government by force or violence (CSCA).

45.     Plaintiff does not advocate or belong to an organization which advocates the overthrow of the government by force or violence.

46.     During this meeting on September 4, 2019, and consistent with the Interoffice Correspondence, Plaintiff was told that his employment was being terminated because he violated the Social Media Policy.

47.     Plaintiff was informed that he posted offending social media posts on his private Facebook page, and that these posts were sent by a complaining citizen to either the mayor's office or Defendant Jordan's office, he was unclear which.

48.     Plaintiff asked if they (those responsible for the decision to fire him, including Defendant Jordan) were going to give him a chance to explain "his side of it," and he was told by Captain Bell and the Internal Affairs officer to his immediate left that they were not there to listen to anything Plaintiff had to say and that he needed to sign the termination paper.

49.     Plaintiff stated that this was not right and that he had done nothing wrong. Plaintiff asked if there was any way that he could talk to Defendant Jordan about this decision to terminate his employment.

50.     The officers would not say whether Plaintiff would be given a chance to discuss the matter with Defendant Jordan.  All they would say was that they would pass the message to him (Defendant Jordan), but they were not going to discuss anything further about this with Plaintiff.

51.     Plaintiff was then told to strip off his vest and relinquish all of his credentials that were issued to him by the TPD.  Plaintiff complied.

52.     Plaintiff continued to try and talk with the officers about the matter, but they refused to speak with him.  Plaintiff told them that the posts were three to six years old and that this decision to terminate his employment was complete "BS" and they knew it.

53.     Earlier that day (at or about 11:11 a.m.) and prior to Plaintiff arriving at work, a friend forwarded to Plaintiff a copy of Marq Lewis' Facebook post which referred to a number of old social media postings allegedly made by Plaintiff.  In the post forwarded by Plaintiff's friend, Marq Lewis falsely claims, *inter alia*, that "Officer Brown has biases towards people who practice Islam and Black Americans."

54.     Plaintiff did not have any indication that old posts appearing on his Facebook page were an issue until seeing the message sent to him by his friend.  Upon seeing Marq Lewis' post, Plaintiff wasn't sure what the forwarded message was all about or why Marq Lewis would be trolling his Facebook page for old posts.  However, upon being confronted by Captain Bell and the other officers, Plaintiff understood that something was brewing behind the scenes and

that his Facebook posts referenced by Marq Lewis were the posts that served as the basis for his firing.

54. Plaintiff asked the officers to please not make him do a "shame walk" in front of everyone as he left, and they agreed that they would make sure the hallways were clear so he could leave.

56. The officers told Plaintiff that he had to remove his shirt and that he was not allowed to leave with it. Plaintiff was completely devastated at this point. He signed the Interoffice Correspondence as directed, even though he did not want to. He was given a copy for his records.

57. Plaintiff told the officers that his patrol rifle was in the police car. The rifle was retrieved by one of the Internal Affairs officers. The officers cleaned out the police car and brought Plaintiff the items that he had purchased that were in the vehicle.

58. Plaintiff was then led out of the meeting room and out the back door.

59. Captain Bell instructed Plaintiff to bring whatever he had at his house to the division the next day so they did not have to come get it and embarrass Plaintiff any further. Plaintiff departed the Riverside Division totally dejected, embarrassed, and humiliated. He headed home realizing that his dream of being a police officer was over.

60. Plaintiff was understandably angered by the way this all transpired. He had successfully completed background checks, interviews, and other inspections of his character. He completed twenty-eight rigorous weeks of training at the police academy and nearly a month of field training as a police officer. He had committed himself to being the best police officer possible. Not once during this arduous process did anyone suspect Plaintiff of harboring any bias toward anyone, because he doesn't. Not once during this arduous process did anyone

complain to him about posts made three to six years ago on his Facebook page.  Indeed, Defendant Jordan didn't have the courage to confront Plaintiff personally or to allow Plaintiff an opportunity to discuss the matter with him.  Instead, Defendant Jordan allowed a local political activist who was well known in the community, particularly amongst the police officers, as a person who harbors anti-police bias to cause Plaintiff's firing based on the content and viewpoint of Plaintiff's public issue speech made years prior to his hiring by the TPD.

61.     The next day, September 5, 2019, around 1:00 p.m., Plaintiff returned to the Riverside Division to return the rest of the TPD property he had in his possession.  Plaintiff met with Captain Bell, and he told the officer that his Bluetooth headphones were still in the police car and that he needed to retrieve them.  Captain Bell directed Plaintiff to drive his personal vehicle around the back of the building to the parking lot, which he did.  There, Captain Bell gave Plaintiff his headphones after retrieving them from the police vehicle.

62.     After giving him his headphones, Captain Bell told Plaintiff, "On a personal note I didn't want to do this (referring to Plaintiff's termination) and I think its BS, but understand I have a job to do as well and best of luck to you in the future," or words to that effect.  Captain Bell also told Plaintiff that he was a good officer and they (the TPD) needed people like him. Plaintiff responded by saying, "Thank you," and he shook Captain Bell's hand.  Plaintiff then departed the division and headed home for good.

63.     Plaintiff was never given an opportunity to discuss the matter with Defendant Jordan.

64.     Shortly after Plaintiff's firing, news reports began circulating and social media erupted, condemning Plaintiff and vilifying him as a racist and an Islamophobe.  For example, on

September 6, 2019, CAIR-OK issued a press release titled, "CAIR-OK Applauds Termination of Tulsa Police Officer for Islamophobic Social Media Posts."

65.     CAIR-OK is an affiliate of CAIR-National.  CAIR-National was an unindicted co-conspirator/joint-venturer in one of the largest terrorism financing trials prosecuted by the U.S. Government.  Persons who oppose or are critical of CAIR's nefarious, Islamists agenda are labeled by CAIR as "Islamophobes" in an effort to marginalize and ultimately silence their speech.

66.     In response to a media inquiry, Sgt. Shane Tuell, TPD's Public Information Officer, wrote: "Early yesterday morning the police department was notified of some questionable social media posts by one of our officers.  The Chief [Defendant Jordan] immediately ordered internal affairs to open an investigation, and within one hour and 15 minutes of receiving the complaint the officer was terminated."

67.     Defendants confirmed with the media that Plaintiff was terminated because Defendants believed that Plaintiff violated the Social Media Policy prohibiting personnel "from posting forms of speech that express bias against any race, religion, or protected class of individuals."

68.     The social media posts that served as Defendants' basis for terminating Plaintiff were posts that were posted or shared on Plaintiff's Facebook page three to six years prior to the start of his employment with the TPD.

69.     All of the Facebook posts at issue involve Plaintiff speaking as a private citizen commenting on a matter of public concern.

70.     The three Facebook posts identified by Marq Lewis and which prompted Plaintiff's termination include the following:

A.      An image of yet-to-be-president Donald Trump, which was posted on or about August 6, 2015:



B.      An image making the point that Americans (particularly Christians, such as Plaintiff, who will not convert or submit to Islam as a matter of religious conviction) will not surrender or submit to sharia-supremacism, which is a tyrannical form of government prevalent in countries such as Iran and a form of governance demanded by terrorist organizations such as ISIS and Al Qaeda.  The image was posted on or about November 15, 2015:



C.      An image created by the famous American sniper and decorated war hero Chris Kyle superimposed over the American flag with a thin blue line—the flag image is

associated with the "blue lives matter" movement.  This image was posted on or about March 24, 2016.



71.    Additional images appearing in Marq Lewis' Facebook post complaining about Plaintiff and that are attributable to Plaintiff appear below:

A.    An image of Michelle Obama with a message urging her to take her "South Chicago Values" and "Socialist Family" back to Chicago.  The image was posted by "Prepare to Take America Back" and shared by Plaintiff on or about March 22, 2013:



B.     An image posted by "Police Officers" that was shared by Plaintiff on or about April 26, 2013, appearing as follows:



C.     An image posted by "Stop Islamization of the world" and shared by Plaintiff on or about March 25, 2013, appearing below.  "Islamization" is a term used to describe sharia-supremacism, which, as noted, is a political movement of Islamists, as typically found in Sudan, Pakistan, and Iran, for example.



D.     An image posted in or about September 2014, appearing as follows:



E.      An image posted by "The Inmates of the Asylum" and shared by Plaintiff on or about March 19, 2013, appearing below.  The quote is attributable to Darynda Jones, a New York Times bestselling author of the *Charley Davidson* series of paranormal romantic thrillers.  The specific quote is from Jones' *Fourth Grave Beneath My Feet* and a simple Google search reveals that it is commonly used, particularly by those who have an interest in murder mysteries.



F.      Marq Lewis also posted the following image of Plaintiff and a fellow officer that Plaintiff recently posted (August 15, 2019) to his Facebook page.  Marq Lewis' purpose for sharing this image to his followers was to show them a picture of Plaintiff.  This is

the only image of those listed by Marq Lewis that Plaintiff posted to Facebook while he was employed by the TPD:



72.     All of the postings that served as the basis for terminating Plaintiff's employment with the TPD were made years before Plaintiff was employed by the TPD.

73.     It is false to equate the rejection of sharia-supremacism—a principle that guided and motivated the terrorists to kill innocent Americans on 9/11, as just one example—with bias against Islam in general.  Because someone rejects Nazism, for example, does not mean that the person is biased against all Germans (and national origin is a protected class).

74.     Our nation's fight against ISIS, Al Qaeda, and the Taliban is, at its core, a fight against sharia-supremacism—a reason why it was so important to destroy the caliphate that ISIS claimed it was creating.

75.     Islamists overseas have mercilessly persecuted and murdered Christians.  Many Chaldean Christians, as just one example, have fled Iraq because of this persecution.

76.     Contrary to the opinion of those who oppose President Trump—people like Marq Lewis—a person is not a racist simply for supporting our duly elected President.

77.     Each of the offending Facebook posts constitutes speech made by Plaintiff as a private citizen commenting on matters of public concern.

78.     Each of the subjects represented in the offending Facebook posts constitutes public issue speech.

79.     None of the offending speech contains obscene or sexually explicit language, images, or acts, and none of the offending speech ridicules, maligns, disparages or otherwise expresses bias against any race, religion, or protected class of individuals.

80.     Each of the offending Facebook posts conveys a *personal* political or religious viewpoint.

81.     None of the offending Facebook posts provide a scintilla of evidence that Plaintiff would unlawfully discriminate against anyone while he was serving as a police officer with the TPD.  Indeed, Plaintiff has demonstrated through his actions that he possesses the ability, character, motivation, and skill to be an exceptional police officer.

82.     Defendants terminated Plaintiff's employment because a local political activist and his followers disagree with Plaintiff's political and religious views.

83.     Defendants' termination of Plaintiff caused Plaintiff public humiliation, embarrassment, anger, and stress.  At times, Plaintiff would avoid going out in public, particularly with family and friends, because of this humiliation and embarrassment and his desire not to subject his family and friends to similar humiliation, harassment, or embarrassment on his account.

84.     Defendants' termination of Plaintiff has undermined the trust and confidence that the TPD police officers have in their leadership.  Plaintiff's firing demonstrates to the rank and file of the TPD that their leadership, in particular Defendant Jordan, will "throw them under the bus" to promote political correctness and to appease political activists like Marq Lewis and CAIR-OK.  Defendants' termination of Plaintiff erodes the esprit de corps of the TPD.

85.     Defendants' termination of Plaintiff's employment did not advance any legitimate government interest and, in fact, was contrary to the government's legitimate interests by undermining the confidence and trust that TPD officers have in their leadership.

86.     Defendants' termination of Plaintiff is contrary to any legitimate government interest in that it has impaired discipline by superiors and harmony among coworkers, it has had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, and it has thus impeded the performance of other officers and interfered with the regular operation of the TPD.

## FIRST CLAIM FOR RELIEF

### (Freedom of Speech—First Amendment)

87.     Plaintiff hereby incorporates by reference all stated paragraphs.

88.     By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants have deprived Plaintiff of his right to freedom of speech in violation of the Free Speech Clause of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

89.     Defendants terminated Plaintiff's employment with the TPD based on the content and viewpoint of Plaintiff's speech while Plaintiff was a private citizen commenting on matters of public concern.

90.     Defendants' Social Media Policy, facially and as applied to punish Plaintiff for his private speech, violates the Free Speech Clause of the First Amendment.

91.     Defendants punished Plaintiff and retaliated against him because of the expression of his political and religious viewpoints, in violation of Plaintiff's right to freedom of speech protected by the First Amendment.

92.     By punishing and retaliating against Plaintiff for exercising his right to freedom of speech, Defendants have violated the Free Speech Clause of the First Amendment.

93.     As a direct and proximate result of Defendants' violation of the Free Speech Clause of the First Amendment, Plaintiff has suffered irreparable harm, including the loss of his fundamental constitutional rights, adverse employment consequences, humiliation, embarrassment, loss of revenue, loss of public reputation, and other compensable harm entitling him to declaratory and injunctive relief and damages.

## SECOND CLAIM FOR RELIEF

### (Equal Protection—Fourteenth Amendment)

94.     Plaintiff hereby incorporates by reference all stated paragraphs.

95.     By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, Defendants deprived Plaintiff of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

96.     Defendants' termination of Plaintiff, which selectively targeted the content and viewpoint of Plaintiff's speech and political beliefs, violated the Equal Protection Clause of the Fourteenth Amendment.

97.     Defendants' unlawful actions had a discriminatory effect on Plaintiff on account of Plaintiff's political and religious beliefs in violation of the Equal Protection Clause of the Fourteenth Amendment.

98.     Defendants chose to selectively enforce their policies, practices, procedures, and/or customs against Plaintiff out of an arbitrary desire to discriminate against Plaintiff because of the content and viewpoint of his political beliefs in order to appease those who oppose the content and viewpoint of Plaintiff's political beliefs in violation of the Equal Protection Clause of the Fourteenth Amendment.

99.     Under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views, which is what Defendants have done by terminating Plaintiff.

100.    As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiff has suffered irreparable harm, including the loss of his fundamental constitutional rights, adverse employment consequences, humiliation, embarrassment, loss of revenue, loss of public reputation, and other compensable harm entitling him to declaratory and injunctive relief and damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court:

A)     to declare that Defendants violated Plaintiff's constitutional rights as set forth in this Complaint;

B)     to declare that the termination of Plaintiff's employment as a police officer with the TPD was unlawful;

C)     to enjoin the enforcement of Defendants' unconstitutional acts, policies, practices, procedures, and/or customs that were the moving force behind the violation of Plaintiff's constitutional rights as set forth in this Complaint;

D)       to expunge all paperwork or references from Plaintiff's personnel file related to the incident giving rise to Defendants' violation of his constitutional rights as set forth in this Complaint and prohibiting the use of any such paperwork or references in any future employment matter;

E)       to award Plaintiff nominal and compensatory damages;

F)       to award Plaintiff his reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

G)       to grant such other and further relief as this Court should find just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all issues triable of right by a jury.

Respectfully submitted,

WOOD, PUHL & WOOD, PLLC

/s/ Scott Wood
Scott B. Wood, OBA No. 12536
2409 E. Skelly Drive, Suite 200
Tulsa, Oklahoma 74105
Tel (918) 742-0808 / Fax (918) 742-0812

AMERICAN FREEDOM LAW CENTER

Robert J. Muise, Esq.* (P62849)
P.O. BOX 131098
Ann Arbor, Michigan 48113
(734) 635-3756
rmuise@americanfreedomlawcenter.org
*Subject to admission pro hac vice

Attorneys for Plaintiff Wayne Brown