## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

WAYNE BROWN,

      Plaintiff,

      v.                                 No. 19-cv-00538-WPJ-FHM

(1) CITY OF TULSA; and

(2) CHARLES W. JORDAN,
individually and in his official capacity as
Chief of Police, Tulsa Police Department;

      Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT CITY OF TULSA'S MOTION TO DISMISS AND GRANTING DEFENDANT JORDAN'S MOTION TO DISMISS

**THIS MATTER** comes before the Court[1] upon Defendants City of Tulsa's ("Defendant City") and Defendant Charles W. Jordan's ("Defendant Jordan") Motions to Dismiss (Docs. 13, 14), each filed February 3, 2020. Plaintiff Wayne Brown ("Plaintiff") timely responded to each (Docs. 17, 18), to which Defendants replied (Docs. 20, 21). Having reviewed the relevant pleadings and the applicable law, the Court finds Defendants' Motions are well-taken and, therefore, **GRANTS** the Motions.

## BACKGROUND[2]

Five years ago, on October 24, 2018, Plaintiff received news from the Tulsa Police Department ("TPD") that he was selected for the Tulsa Police Academy ("Academy"). Doc. 6 at

---

[1] Chief United States District Court Judge William P. Johnson of the District of New Mexico was assigned this case as a result of the Tenth Circuit Order designating Judge Johnson to hear and preside over cases in the Northern District of Oklahoma.

[2] The following recitation of facts derive from Plaintiff's First Amended Complaint (Doc. 6), which the Court, as it must on a motion to dismiss, accepts as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008).

¶ 17. The Academy commenced on January 22, 2019 (at which time Plaintiff began his employment with TPD) and lasted a rigorous twenty-eight weeks. *Id.* at ¶¶ 19, 22. Prior to and during the Academy, Plaintiff was subject to close scrutiny and background investigations to ensure he had the demeanor, character, and temperament to become a uniformed police officer. *Id.* at ¶¶ 20, 22. Twenty-eight weeks later, Plaintiff successfully completed the Academy. *Id.* at ¶ 23. Shortly thereafter, on August 6, 2019, Plaintiff began his field training with TPD Officer Jim Tornberg, which progressed without issue. *Id.* at ¶¶ 26, 28–31. Defendant Charles W. Jordan was the Chief of Police for the TPD during the relevant timeline of this case. *Id.* at ¶16.

Plaintiff's employment as an officer was short-lived and less than one month later, on September 4, 2019, he was terminated from TPD. *Id.* at ¶ 32. On the morning of his termination, Plaintiff knew something was brewing behind the scenes. *Id.* at ¶ 56. This is because around 11:11 a.m., a friend forwarded to Plaintiff a copy of a local political activist's Facebook posts which referred to a number of old posts made by Plaintiff. *Id.* at ¶ 55. Marq Lewis, "a local, radical, left-wing, political activist and agitator" posted on his Facebook that Plaintiff "has biases towards people who practice Islam and Black Americans." *Id.* at ¶¶ 33, 37. Lewis reached this conclusion by referencing "very offensive social media" posts made by Plaintiff, under his Facebook name, "Duke Brown." *Id.* at ¶¶ 38. The posts complained of by Lewis are described by him as follows (typographical errors in original):

> Image of The president riding a lion with the Confederate flag.
> Image of the a first, acknowledging a fight against the religious faith, Islam.
> Image of the punisher with crosshairs. The image originated from the American sniper Chris Kyle who was very controversial with killing Iraqi citizens along with killing American citizens during Katrina."

*Id.* at ¶¶ 38, 72.A, 72.B., 72.C. *See infra* Table 1.

Marq Lewis then made a complaint to Defendants regarding these old Facebook posts. *Id.* at ⁋ 34. With a hunch that something was brewing, at approximately 2:05 p.m., Plaintiff was told by Captain Thom Bell to come in the meeting room where Captain Luke Sherman and Internal Affairs officers were waiting. *Id.* at ⁋ 40. Plaintiff entered the room, the door was closed behind him, and he was instructed to remove his gun belt. *Id.* at ⁋ 41. Plaintiff complied and handed his gun belt to the Internal Affairs officer to his immediate left, who then laid it on the table. *Id.* at ⁋ 42. Plaintiff was told to sit down, which he did. *Id.* at ⁋ 43. He was then handed an Interoffice Correspondence from Defendant Jordan dated September 4, 2019, with the subject line, "Personnel Order #19-257 Termination," and was told to read it. *Id.*[3] The Interoffice Correspondence stated Plaintiff's employment was "hereby terminated effective immediately," because the TPD "was made aware of social media postings made by [Plaintiff] that violate Department Rules & Regulations and Policies and Procedures." *Id.*

The relevant TPD policy is "Policy and Procedure 31-324 (Social Media and Networking) Procedures C.6.," which states,

> Department personnel should be mindful that their speech, when using social media, is public and becomes part of the worldwide electronic domain, Therefore, adherence to the department's code of conduct is required in the personal use of social media. In particular, department personnel are prohibited from posting speech containing obscene or sexually explicit language, images, acts, and statements or other forms of speech that ridicule, malign, disparage, or otherwise express bias against any race, religion, or protected class of individuals.

*Id.* at ⁋ 45 (*hereinafter* "TPD Social Media Policy").

During the meeting on September 4, and consistent with the Interoffice Correspondence, Plaintiff was told that his employment was being terminated because he violated the TPD Social

---

[3] The Interoffice Correspondence, referenced in the First Amended Complaint, was also attached to the Complaint as Exhibit A. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").

Media Policy via his Facebook posts complained of by a citizen. *Id.* at ¶¶ 48–49. "Within one hour and fifteen minutes of receiving the complaint the officer was terminated," TPD Sergeant Shan Tuell told reporters. *Id.* at ¶ 35. After receiving his termination, Plaintiff asked if they were going to give him a chance to explain "his side of it," to which Captain Bell and an Internal Affairs officer said they were not there to listen to anything Plaintiff had to say and that he needed to sign the termination paper. *Id.* at ¶ 50. Plaintiff stated that this was not right and that he had done nothing wrong. *Id.* at ¶ 51. Plaintiff told them that the posts were three to six years-old and that termination was complete "BS." *Id.* at ¶ 54. Nevertheless, Plaintiff asked if there was any way that he could talk to Chief Jordan about this termination decision. *Id.* at ¶ 52. The officers would not say exactly but did say they would relay his message to Chief Jordan. *Id.*

To avoid further embarrassment, Plaintiff asked the officers to please not make him do a "shame walk" in front of everyone as he left, and they agreed. *Id.* at ¶ 57. Plaintiff signed the Interoffice Correspondence, though he did not want to. *Id.* at ¶ 58. His patrol car was cleaned out and Plaintiff was then led out of the meeting room and out the back door. *Id.* at ¶¶ 59–60. At this point, Plaintiff was "totally dejected, embarrassed, and humiliated." *Id.* at ¶ 61.

The next day, September 5, 2019, at around 1:00 p.m., Plaintiff returned to TPD to bring the rest of his TPD property he still had and to retrieve personal headphones he had left. *Id.* at ¶ 63. Upon giving him his personal headphones, Captain Bell told Plaintiff, "On a personal note I didn't want to do this . . . and I think [it's] BS, but understand I have a job to do as well and best of luck to you in the future," or words to that effect. *Id.* at ¶ 64.

Then the media got a hold of the story. Shortly after the firing, news reports began circulating and social media erupted, condemning Plaintiff and labeling him as a racist and an Islamophobe. *Id.* at ¶ 66. In response to a media inquiry, Sgt. Tuell, TPD's Public Information

Officer, wrote: "Early yesterday morning the police department was notified of some questionable social media posts by one of our officers. The Chief . . . immediately ordered internal affairs to open an investigation, and within one hour and 15 minutes of receiving the complaint the officer was terminated." *Id.* at ¶ 68. Defendants confirmed with the media that Plaintiff was terminated because Defendants believed that Plaintiff violated the TPD Social Media Policy prohibiting personnel "from posting forms of speech that express bias against any race, religion, or protected class of individuals." *Id.* at ¶ 69. Below is a table of three social media posts that Plaintiff alleges "served as Defendants' basis for terminating Plaintiff," along with Plaintiff's description of the posts. *Id.* at ¶ 72.[4] All of the posts that potentially served as the basis for terminating Plaintiff were made years before Plaintiff's employment with TPD. *Id.* at ¶ 74.

**Table 1**

| ¶ | Facebook Post | Plaintiff's Description |
|---|---|---|
| 72.A. | | "An image of yet-to-be-president Donald Trump ('Trump Post'), which was posted on or about August 6, 2015:" |

---

[4] In total, there were nine Facebook posts that Marq Lewis complained of on social media. Doc. 6, at ¶¶72–73. However, Plaintiff alleges that it is three posts (¶¶ 72.A., 72.B., 72.C.) that likely prompted his termination. *Id.* at ¶72. Also, at a hearing, Deputy Chief Eric Dalgliesh stated Plaintiff was terminated for posting only two images: the Trump Post and the Blue Lives Matter Post. *Id.* at ¶ 90. Therefore, the Court will confine its analysis to the three posts in Table 1.

| 72.B. |  | "An image making the point that Americans (particularly Christians, such as Plaintiff, who will not convert or submit to Islam as a matter of religious conviction) will not surrender or submit to sharia-supremacism, which is a tyrannical form of government prevalent in countries such as Iran and a form of governance demanded by terrorist organizations such as ISIS and Al Qaeda. The image was posted on or about November 15, 2015:" |
|---|---|---|
| 72.C. | | "An image created by the famous American sniper and decorated war hero Chris Kyle superimposed over the American flag with a thin blue line—the flag image is associated with the 'blue lives matter' movement. This image ('Blue Lives Matter Post') was posted on or about March 24, 2016." |

Plaintiff alleges that the termination has caused him public humiliation, embarrassment, anger, and stress. *Id.* at ¶ 85. He alleges that this termination has undermined the trust and confidence that the TPD police officers have in their leadership, in that Defendants' will "throw them under the bus" to promote political correctness and appease political activists. *Id.* at ¶ 86.

Because of his termination, Plaintiff requested unemployment benefits, which were initially denied. *Id.* at ¶ 89. Deputy Chief Eric Dalgliesh, who was testifying for the City, stated

that Plaintiff was terminated for posting only two images on his Facebook page: the Trump Post and the Blue Lives Matter Post. *Id.* at ¶ 90. On September 26, 2019, Plaintiff submitted to the City Clerk a Notice of Tort Claim, seeking recovery for wrongful termination under state law. *Id.* at ¶ 92.

Plaintiff filed this action in federal court on October 9, 2019, against Defendant City of Tulsa and Defendant Charles W. Jordan, in his official and individual capacities. *See* Docs. 2, 6. In his First Amended Complaint, Plaintiff alleges that the Defendants violated his First Amendment rights by retaliating against his speech, Defendants violated his rights under the Equal Protection Clause of the Fourteenth Amendment, and Defendants wrongfully discharged Plaintiff under Oklahoma common law (*Burk* claim). Doc. 6 at ¶¶ 94–110. Plaintiff seeks declaratory relief, injunctive relief, and damages. *Id.* at Prayer for Relief. Defendants then filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Docs. 13, 14.

## STANDARD

The federal rules require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a court must accept all the complaint's factual allegations as true, the same is not true of legal conclusions. *See id.* Mere "labels and conclusions" or "formulaic recitation[s] of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. "Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true,

plausibly suggest the defendant is liable." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

Overall, the "plausibility" standard refers to "the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). "'The *Twombly* standard may have greater bite' in the context of a § 1983 claim against individual government actors, because 'they typically include complex claims against multiple defendants.'" *Kan. Penn Gaming, LLC*, 656 F.3d at 1215 (quoting *Robbins*, 519 F.3d at 1249). It is "particularly important in such circumstances that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Kan. Penn Gaming, LLC*, 656 F.3d at 1215 (internal quotation marks omitted).

## DISCUSSION

The Court will first discuss Defendant City of Tulsa's Motion to Dismiss (Doc. 13), including the First Amendment claim and the equal protection claim. Second, the Court will discuss Defendant Jordan's Motion to Dismiss (Doc. 14), including the official capacity claims, and the claims in his individual capacity (First Amendment and equal protection claims). Third, the Court will move on to discuss the declaratory and injunctive relief requested by Plaintiff. Finally, the Court will discuss Plaintiff's state law *Burk* claim against both Defendants.

## I.   City of Tulsa

### A.   First Amendment Claim

Plaintiff argues that Defendant City punished and retaliated against him because of the expression of his political and religious viewpoints, in violation of Plaintiff's First Amendment free speech rights. Doc. 6, at ¶¶ 95–100; Doc. 17. Defendant City disagrees and concludes its interest, as employer, outweighed Plaintiff's free speech interest. Doc. 13. For reasons detailed below, the Court finds Defendant City's Motion is well-taken.

Sitting on the Supreme Judicial Court of Massachusetts in 1892, Justice Holmes observed: A policeman "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. City of New Bedford*, 29 N.E. 517, 517 (Mass. 1892). This was the unchallenged dogma for many years, that "a public employee had no right to object to conditions placed upon terms of employment—including those which restricted the exercise of constitutional rights." *Connick v. Myers*, 461 U.S. 138, 143 (1983). However, that "dogma has been qualified in important respects." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

Now, the Supreme Court "has made clear that public employees do not surrender all their First Amendment rights by reasons of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. at 417. This First Amendment protection exists even if the public employee is probationary and even if the public employee can be discharged for any reason or no reason at all. *Rankin v. McPherson*, 483 U.S. 378, 383–84 (1987). The challenge, however, is to "arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Tp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968); *see also Garcetti*, 547 U.S. at 420 ("The Court's decisions, then, have sought to promote the individual and societal interests that are

served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions.").

The *Pickering* Court sought to achieve this balance through the adoption of a four-part test to be implemented in public-employee, free-speech cases. *See, e.g., Kent v. Martin*, 252 F.3d 1141, 1143 (10th Cir. 2001) (describing *Pickering* test). The Court in *Garcetti* "expanded on the *Pickering* test by adding a fifth, threshold inquiry that seeks to determine whether the speech at issue was made pursuant to the public employee's official duties." *Leverington v. City of Colorado Springs*, 643 F.3d 719, 724 (10th Cir. 2011). "Thus, after *Garcetti*, 'it is apparent that the "*Pickering*" analysis of freedom of speech retaliation claims is a five-step inquiry which we now refer to as the "*Garcetti/Pickering*" analysis.'" *Id.* (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007)).

The familiar *Garcetti/Pickering* test includes the following inquiries:

> (1) Whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Duda v. Elder*, 7 F.4th 899, 910 (10th Cir. 2021). "'The first three elements are issues of law for the court to decide, while the last two are factual issues typically decided by the jury.'" *Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018) (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014)).

### i.    *Employee's Official Duties*

Defendant City states, "there is no dispute that Plaintiff spoke as a private citizen rather than as a public employee and the first element of the *Garcetti/Picke[r]ing* analysis is satisfied."

Doc. 13, at 11. Plaintiff states, "it is without dispute that Plaintiff's protected expression was made *years prior* to his hiring by the City as a police officer and thus well before he was a public employee . . . ." Doc. 17, at 17 (emphasis in original). The First Amended Complaint alleges Plaintiff commenced his employment with TPD on January 22, 2019, and the Facebook posts at-issue were published in 2015 and 2016. Doc. 6, at ¶¶ 19, 72. Therefore, it is undisputed by the parties and there are no allegations in the First Amended Complaint to indicate Plaintiff's exercise of his right to free speech was made pursuant to his official duties. Therefore, this element weighs in Plaintiff's favor. *See Cramer v. Okla. Cnty. Bd. Of Cnty. Comm'rs*, 2018 WL 8966815, at *4 (W.D. Okla. May 30, 2018).

### ii.    *Matter of Public Concern / Protected Expression*

A "public employee's speech is entitled to *Pickering* balancing only when the employee speaks 'as a citizen upon matters of public concern' rather than 'as an employee upon matters only of personal interest.'" *City of San Diego v. Roe*, 543 U.S. 77, 83 (2004) (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)). Whether speech addresses a matter of public concern is determined by "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. at 147–48. Public concern relates "to any matter of political, social, or other concern to the community . . . ." *Id.* at 146. Additionally,

> public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication. The Court has also recognized that certain private remarks, such as negative comments about the President of the United States, touch on matters of public concern and should thus be subject to *Pickering* balancing.

*City of San Diego v. Rose*, 543 U.S. at 83–84.

If an employee's speech does not touch on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech."

*Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *see also Connick*, 461 U.S. at 146 (If the speech does not relate to any matter of public concern, then "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.").

However, the Tenth Circuit has recognized the threshold public concern test is not applicable to all situations. In *Flanagan v. Munger*, police officers were reprimanded for violating off-duty employment regulations for conduct unbecoming of an officer by owning and operating a video rental store that sold and rented out sexually explicit videos. 890 F.2d 1557, 1560–61 (10th Cir. 1989). The officers sued the Chief of Police and the City, alleging the defendants violated their First Amendment rights. *Id.* at 1561. The Tenth Circuit stated that the *Pickering/Connick* public concern test does not apply "when public employee nonverbal protected expression does not occur at work and is not about work." *Id.* at 1564. The Court identified that simply owning a store is "not debate or explicit verbal speech" and if "plaintiffs had made off-duty statements supporting sexually explicit films, those comments would almost surely relate to a matter of public concern." *Id.* at 1563. The *Flanagan* Court explained:

> When a statement is made at or about work, use of the public concern test, indeed a narrow definition of public concern. . . . However, in a case like this of nonverbal protected expression not at or about the workplace, the "speech" already takes place outside of the workplace and thus the purpose behind using the public concern is simply irrelevant.

> The formulation of the public concern test in *Connick* and its progeny also implies that the test is not intended to apply to areas in which the employee does not speak at work or about work. . . . Thus, the *Connick* public concern test is intended to weed out speech by an employee speaking *as* an employee upon matters only of personal interest. The speech of the plaintiffs in this case is clearly not speech as an employee, and thus does not fulfill the purpose of the public concern test. . . . Clearly, plaintiffs are not speaking as employees and thus do not fit the narrow spectrum which the public concern test is meant to identify.

Thus, we conclude that the public concern test does not apply when public employee nonverbal protected expression does not occur at work and is not about work.

*Id.* at 1564.

The Tenth Circuit announced, "[t]he alternative test should be whether the speech involved is 'protected expression.' If the speech involved is protected expression, then the second half of the existing *Pickering* test . . . should be applied." *Id.* at 1564–65. Other courts have applied the *Flanagan* test to public employee speech which occurs out of work and is unrelated to work. *See, e.g.*, *Rothschild v. Bd. Of Educ. of City of Buffalo*, 778 F. Supp. 642, 654–55 (W.D.N.Y. Dec. 5, 1991) (Teachers were disciplined for their participation in the production of a videotape filmed at a public school outside of work hours. The *Rothschild* Court applied the Tenth Circuit's approach in *Flanagan* and held the speech was protected); *Hawkins v. Dep't of Pub. Safety and Corr. Services*, 602 A.2d 712, 719–20 (Md. 1992) (considering *Flanagan* while analyzing a prison guard's abusive words and conduct towards a private citizen while guard was off duty, away from the prison and out of uniform); *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 196 F. Supp. 2d 229, 250 (E.D. N.Y. Feb. 26, 2002) ("there is no province in trying to discern if a protected expression or association is in regard to a matter of public concern if it is not about work or related to work").

The Court recognizes that *Flanagan's* holding relates to nonverbal expression and the Tenth Circuit has declined to extend *Flanagan* to an employee's out of work verbal expression. *See Leverington v. City of Colorado Springs*, 643 F.3d 719 (10th Cir. 2011). In *Leverington*, a nurse was terminated after she told a police officer who issued her a speeding ticket that she "hoped she never had him as a patient." *Id.* at 722. The Tenth Circuit declined to apply *Flanagan* stating, the nurse's "statement was clearly verbal expression, it related to her work, and it potentially had

an impact upon her employer. Unlike the difficulty in *Flanagan* in determining what 'comment' was being made . . ., here we have no difficulty in evaluating Ms. Leverington's statement. *Id.* at 725. Based upon the facts of this case, the Court considers *Flanagan's* protected expression test to be the more appropriate test to apply.[5] Plaintiff clearly did not speak as an employee, his speech did not concern work, and his speech did not occur at work. *Flanagan*, 890 F.2d at 1564.

Plaintiff alleges that two, but possibly three, Facebook posts formed the basis of his termination: the "Trump Post," the "Blue Lives Matter Post," and the November 15, 2015, post. *See* Doc. 6, at ¶¶ 72, 90. Therefore, the Court will only analyze whether these three Facebook posts are protected expression. *Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.").

### 1.     August 6, 2015, Trump Post

The first post at issue is an image of then-presidential candidate Donald Trump riding a lion with a confederate flag in the background, posted August 6, 2015. *See* Doc. 6, at ¶ 72.A.; Table 1. "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted). Political speech is "at the core of protected speech." *Bass v. Richards*, 308 F.3d 1081, 1089 (10th Cir. 2002). The August 6, 2015, post of Donald Trump is a protected expression of political speech.

### 2.     March 24, 2016, Blue Lives Matter Post

The next post is an image allegedly created by American veteran Chris Kyle superimposed over the American Flag with a thin blue line—the image associated with the "Blue Lives Matter"

---

[5] The Court acknowledges the Defendant City contends the public concern test is the appropriate test to apply. *See* Doc. 13, at 11; Doc. 20, at 3. Regardless, both parties concede either test is met (for the three posts at issue) and both proceed to *Pickering* balancing. *See* Doc. 13, at 11; Doc. 17, at 16.

movement. Doc. 6, at ¶ 72.C.; Table 1. The post contains the words, "despite what your momma told you . . . violence does solve problems." *Id.* Recently, the Honorable J. Nicholas Ranjan of the District Court of the Western District of Pennsylvania acknowledged that political or social-protest speech—such as employees wearing facemasks that displayed the slogan "Black Lives Matter"— was social speech which struck "at the heart of the most valuable speech protected by the First Amendment." *Amalgamated Transit Union Local 85 v. Port Auth. of Alleghany Cnty.*, 513 F. Supp. 3d 593, 612 (W.D. Pa. Jan. 19, 2021). Just as speech concerning the Black Lives Matter movement is protected social speech, so is speech promoting the Blue Lives Matter movement.

### 3.    November 15, 2015, Post

Lastly, Plaintiff posted an image with the text, "Pledge to my family, flag and country when the day comes I will fight to my last breath, before I submit to Islam." Doc. 6, at ¶ 72.B.; Table 1. "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (citing *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). There are certain well-defined and narrowly limited classes of speech which are not afforded Constitutional protection. *See id.* Speech which incites imminent lawless action, true threats and fighting words are not protected. *Id.* at 359. Speech cannot be curtailed "simply because the speaker's message may be offensive to his audience." *Hill v. Colorado*, 530 U.S. 703, 716 (2000). The Court does not consider this post to be one of the exceptions to Constitutional protection. Fighting words are those "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Virginia v. Black*, 538 U.S. at 359. While this post contemplates fighting, the Court does not find it was inherently likely to provoke a violent reaction. Nor does the Court consider the post

15

to incite imminent lawless action or constitute a true threat. For these reasons, the November 15, 2015, post is protected expression.

### iii.    *Balancing the Parties' Interests*

Having concluded that the Facebook posts at issue are protected expression, the Court must now proceed to the third element of the *Garcetti/Pickering* test. The Defendant City contends it have a superior interest in maintaining the public's confidence, Plaintiff's Facebook posts did cause a "significant actual disruption," and Plaintiff's Facebook posts "harmed the public's trust in Plaintiff as a Tulsa Police Officer in that he would treat <u>all</u> members of the community fairly." Doc. 13, at 17 (emphasis in original). Conversely, Plaintiff argues the City did not have a legitimate interest in limiting his speech, his speech did not cause an *internal* disruption, and the City's termination of his employment amounts to an impermissible heckler's veto. *See* Doc. 17, at 19–20.

The balance of Plaintiff's right to free speech and the employer's right to curtail activity which interferes with the efficient operation of the office does not occur in a vacuum. *Flanagan v. Munger*, 890 F.2d 1557, 1564–65 (10th Cir. 1989). "The manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* Essentially, the balance must tip in favor of protection "unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Flanagan v. Munger*, 890 F.2d at 1565 (internal quotation marks omitted).

16

The Tenth Circuit has said "the only public employer interest that outweighs the employee's free speech interest is avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships." *Duda v. Elder*, 7 F.4th 899, 912 (10th Cir. 2021) (emphasis in original). This circuit requires "the employer to prove 'actual disruption' when the adverse employment action took place 'long after' the employee spoke on a matter of public concern." *Id.* at 912–13 (citing *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176, 1183 (10th Cir. 2018) (quotations omitted)). A showing of actual disruption is not required if the adverse action occurred soon after the employee's protected speech, but a showing of potential disruption is required. *Id.*[6]

In the context of law enforcement, "a police department's determination that an officer's speech warrants discipline is afforded considerable deference . . . and police departments may permissibly consider the special status officers occupy in the community when deciding what limitations to place on officers' off-duty speech." *Hernandez v. City of Phoenix*, 43 F.4th 966, 979 (9th Cir. 2022) (citation omitted); *see also Fields v. City of Tulsa*, 753 F.3d 1000, 1015 (10th Cir. 2014) ("We have long recognized that law-enforcement agencies have a heightened interest in maintaining discipline among employees."); *Connick v. Myers*, 461 U.S. 138, 151–152 (1983) ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.").

"Efficient law enforcement requires mutual respect, trust and support." *McMullen v. Carson*, 754 F.2d 936, 939 (11th Cir. 1985). This is difficult for the City to achieve if its employees are permitted to publicly broadcast images that causes actual disruption, which the city is required to establish. *Duda*, 7 F.4th at 912–913; *see supra* note 6. Based on facts taken from Plaintiff's

---

[6] Although the Tenth Circuit has never fixed temporal boundaries for the actual disruption test, it has found that "six months falls on the 'long after' side of the line." *Duda v. Elder*, 7 F.4th 899, 913 n. 10 (10th Cir. 2021).

Complaint, Plaintiff's speech itself did create actual disruption. A complaint about the Facebook posts was made by a local activist to TPD; "news reports began circulating and social media erupted," Vilifying Plaintiff as a racist and Islamophobe; TPD administration had to respond to media inquiries; and the termination (because of the Facebook posts) "undermined the trust and confidence that TPD police officers have in their leadership." Doc. 6, at ¶¶ 6, 66–69, 86. The Defendant City contends—uncontroverted by Plaintiff—that the posts "created such a public disruption that Chief Jordan and the Tulsa Police Department received numerous inquiries from concerned citizens," and  the posts "caused public outrage and disruption[,] harmed the public's trust in Plaintiff as a Tulsa Police Officer" and set back the efforts to build trust between TPD and the community. Doc. 13, at 16–17; *see* Doc. 17, at 2–4 (Plaintiff's response to Defendant City, objecting to some of Defendant City's facts).

Here, the Defendant City's interest in maintaining a police force that instills public confidence and prohibits partisanship in law enforcement outweighs Plaintiff's interest in having his expressions protected. *McMullen v. Carson*, 745 F.2d at 939 (affirming district court's application of the *Pickering* balancing test and holding the Sheriff's interest in carrying out the sheriff department's duties to the public outweighed terminated clerk's interest in right to participate in an organization committed to violent, criminal and racist conduct); *Grutzmacher v. Howard County*, 851 F.3d 332, 345 (4th Cir. 2017) (fire department's interest in efficiency and preventing disruption outweighed plaintiff's interest in speaking in manner he did and posting on social media).  Since the Court has found for Defendant City on the *Garcetti/Pickering* balancing (a question of law), the Court need not reach the last two elements, which are "factual issues typically decided by the jury." *Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018) (internal

quotation marks omitted); *see also Duda v. Elder*, 7 F.4th 899, 910–11 (10th Cir. 2021) ("To prevail, a plaintiff must show all five elements.").

Because the Defendant City's interest outweighs Plaintiff's interest in his protected speech, as a matter of law, Plaintiff's First Amendment claim against the City must be dismissed.

### B.    Equal Protection Claim

Plaintiff alleges Defendant City violated his rights under the Equal Protection Clause of the Fourteenth Amendment by selectively targeting the content and viewpoint of Plaintiff's speech and beliefs, and selectively enforcing policies against Plaintiff. Doc. 6, at ¶¶ 101–107. Defendant City argues Plaintiff's "very vague and ill-defined claim" is a "class of one" theory of equal protection, foreclosed by the Supreme Court in *Engquist v. Oregon Dept. of Agric.*, 553 U.S. 591 (2008). Doc. 13, at 19–21. In response, and in an attempt to clarify, Plaintiff relies on *Police Dp't of the City of Chicago v. Mosley* for the conclusion that the law was clearly established: "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." 408 U.S. 92, 96 (1972).

"The Equal Protection Clause is concerned with governmental classifications that 'affect some groups of citizens differently than others,' especially those in 'an identifiable group.'" *Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1221 (10th Cir. 2008) (quoting *Engquist v. Oregon Dep't of Agric.*, 553 U.S. at 600–01. "a public employee-turned-plaintiff must be a member of an identifiable class to bring an equal protection claim, *Pignanelli*, 540 F.3d at 1220, and must allege that "the challenged state action intentionally discriminates between groups of persons." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012).

Here, Plaintiff's complaint fails to plausibly plead sufficient facts of an equal protection violation. Plaintiff has not identified any individual or group who were granted the use of a forum to which he was denied. Nor has Plaintiff alleged he was discriminated against on the basis of membership in some class or group. In effect, Plaintiff argues that he was arbitrarily treated differently from others, without any assertion that the different treatment was based on his membership in any particular class. This type of "class of one" theory of equal protection was foreclosed by the Supreme Court in *Engquist*. *See Engquist*, 553 U.S. at 594 (rejecting in the public employment context a "class of one" theory whereby the plaintiff alleges "she was arbitrarily treated differently from other similarly situated employees, with no assertion that the different treatment was based on membership in any particular class").

For these reasons, Plaintiff has not plausibly pleaded Defendant City violated his right to equal protection. Therefore, the Court dismisses Plaintiff's equal protection claim against Defendant City.

## II.      Defendant Jordan

### A.      Official Capacity Claims

At the outset, the Court will discuss Plaintiff's Section 1983 official capacity claims against Defendant Jordan. "Defendant Jordan is sued individually and in his official capacity as the Chief of Police." Doc. 6, ¶ 16. Defendant Jordan argues that all claims against him in his official capacity are redundant of those against the City and therefore, should be dismissed. Doc. 14, at 4–5. Plaintiff argues—in a footnote—that since Plaintiff was fired based on a TPD social media policy (which may or may not be a City policy), and since Defendant Jordan is a decisionmaker for the City, then Defendant Jordan is the person against whom declaratory and injunctive relief would be appropriate. Doc. 18, at 14 n. 10. Plaintiff, however, *would* agree that naming Defendant Jordan

in his official capacity would not be needed *if* the Defendant City concedes the municipal liability issue. *Id.*

Plaintiff conflates the individual and official capacity claims. If Plaintiff concludes that "Defendant Jordan *would be the person* against whom declaratory and injunctive relief would be appropriate," then an official capacity suit is the wrong vehicle to achieve Plaintiff's relief. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted). In other words, suing Chief Jordan in his official capacity under section 1983, *is the same* as suing the City. This is not a "finding of non-liability but rather of redundancy because of the fact that the City is *already* a defendant in this lawsuit. In other words, [the Chief] in his official capacity *is* the City." *Lopez v. Bd. of Cnty. Comm'rs for Lea Cnty.*, 2016 WL 10588126, at *2 (D.N.M. March 4, 2016); *see also Romero v. Storey*, 2010 WL 11619180, at *2 (D.N.M. Sept. 17, 2010) ("Consequently, § 1983 claims against individual defendants in their official capacities are redundant when those same claims are also brought against the municipal entity that employs the individual defendants."). Overall, "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell* . . . local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. at 167 n. 14.

The official capacity claims against Defendant Jordan would fail for the same reason as the claims against the Defendant City of Tulsa and are redundant. Since the section 1983 official capacity claims against Defendant Jordan are redundant, the Court dismisses with prejudice the official capacity claims against Defendant Jordan for failure to state plausible section 1983 claims. *See Romero v. Storey*, 2010 WL at *2 ("[T]he majority of cases which have dealt with the issue of

redundancy in § 1983 lawsuits have held that the appropriate remedy is, in fact, dismissal of the official capacity claim.") (compiling cases).

### B.     Individual Capacity Claims

Defendant Jordan argues that all claims against him in his individual capacity should be dismissed because he is entitled to qualified immunity. *See* Doc. 14. Plaintiff, conversely, argues that Defendant Jordan violated Plaintiff's clearly established rights and therefore, is not entitled to qualified immunity. *See* Doc. 18.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Although typically at the summary judgment stage, a district court may grant a motion to dismiss based on qualified immunity "but asserting a qualified immunity defense via a Rule 12(b)(6) motion . . . subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021) (internal quotation marks omitted). "Specifically, the court analyzes the defendant's conduct *as alleged in the complaint*." *Id.* (emphasis in original) (internal quotation marks omitted). The Tenth Circuit employs a strict two-part test that the plaintiff must meet: First, the plaintiff must establish "that the defendant violated a constitutional or statutory right," and second, "that this right was clearly established at the time of the defendant's conduct . . . ." *McBeth v. Himes*, 598 F.3d 708, 716 (10th Cir. 2010) (internal quotation marks omitted). The Court has discretion to decide which prong to address first. *Id.* A case is clearly established "when a Supreme Court or Tenth Circuit decision is on point," and the "clearly established law should not be defined at a high level of generality." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir.

2018) (internal quotation marks omitted). Although a prior case need not have identical facts, "the clearly established law must be particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017).

### i.      First Amendment Retaliation

Plaintiff argues that by terminating him, Defendant Jordan violated his clearly established right to free speech. Doc. 18, at 17. Plaintiff principally relies on *Flanagan v. Munger*, 890 F.2d 1557 (10th Cir. 1989), arguing it "compels the Court to deny Defendant Jordan's motion." Doc. 18, at 19.

In *Flanagan*, police officers were reprimanded for violating off-duty employment regulations for conduct unbecoming of an officer by owning and operating a video rental store that sold and rented out sexually explicit videos. 890 F.2d at 1560–61. The officers sued the Chief of Police and the City, alleging the defendants violated their First Amendment rights. *Id.* at 1561. The Tenth Circuit stated that the *Pickering/Connick* public concern test does not apply "when public employee nonverbal protected expression does not occur at work and is not about work." *Id.* at 1564. Importantly, the Court identified that simply owning a store is "not debate or explicit verbal speech" and if "plaintiffs had made off-duty statements supporting sexually explicit films, those comments would almost surely relate to a matter of public concern." *Id.* at 1563. Instead of the public concern test, the Tenth Circuit crafted the "protected expression" test: "If the speech involved is protected expression, then the second half of the existing *Pickering* test—the balancing between the employee's right to free speech and the employer's right to curtail activity which interferes with the efficient operation of the office—should be applied. *Id.* at 1564–65.  Once the Court moved on to *Pickering* balancing, it found in favor of the officers, because any disruption from the speech itself was too attenuated. *Id.* at 1566.

The Court disagrees that *Flanagan* compels the Court—in this qualified immunity context—to deny Defendant Jordan's motion because the facts in *Flanagan* are inapposite here. The issue here is not whether Defendants violated Plaintiff's free speech rights by regulating his unbecoming, outside-of-work business dealings. Dealings which, as the Tenth Circuit identified, had no indicia of verbal speech, statements, nor debate. *Flanagan*, 890 F.2d at 1563. Rather, the issue is whether Plaintiff's termination by Defendants due to his social media posts violated his free speech rights. Thus, *Flanagan* is not particularized to the facts of this case. *See Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) ("the clearly established law must be particularized to the facts of the case" and the "dispositive question is whether the violative nature of *particular* conduct is clearly established") (internal quotation marks omitted). Plaintiff does not cite or analyze any other Tenth Circuit or Supreme Court cases that are particularized to the facts here which establish that Defendant Jordan's actions violated clearly established law.[7] The second prong of the qualified immunity analysis is not satisfied, and Defendant Jordan is entitled to qualified immunity. Therefore, as a matter of law, Plaintiff's First Amendment claim against Defendant Jordan in his individual capacity must be dismissed.

### ii.    *Equal Protection Claim*

Plaintiff also alleges Defendant Jordan violated his rights under the Equal Protection Clause of the Fourteenth Amendment by selectively targeting the content and viewpoint of Plaintiff's speech and beliefs, and selectively enforcing policies against Plaintiff. Doc. 6, at ¶¶ 101–107. Defendant Jordan argues Plaintiff's "very vague and ill-defined claim" is a "class of

---

[7] Plaintiff does cite many cases that stand for the proposition that "public employees may not be discharged in retaliation for speaking on matters of public concern," etc. *See* Doc. 18, at 17. However, such broad statements of law that merely repeat the generic *Garcetti/Pickering* standard are insufficient for the clearly established prong. *See Knopf v. Williams*, 884 F.3d 939, 946–47 (10th Cir. 2018) (concluding that repeating the generic *Garcetti/Pickering* standard is not particularized and fails the second prong of the qualified immunity analysis).

one" theory of equal protection, foreclosed by the Supreme Court in *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591 (2008). Doc. 14, at 10–11.

For the same reasons in the Court's discussion of the equal protection claim against Defendant City, Plaintiff's complaint fails to plausibly plead sufficient facts of an equal protection violation. Plaintiff has not identified any individual or group who were granted the use of a forum to which he was denied. Nor has Plaintiff alleged he was discriminated against on the basis of membership in some class or group. Plaintiff has not plausibly pleaded Defendant Jordan violated his right to equal protection and Plaintiff cannot overcome Defendant Jordan's qualified immunity. Therefore, the Court dismisses Plaintiff's equal protection claim against Defendant Jordan in his individual capacity.

## III. Declaratory and Injunctive Relief

Plaintiff seeks declaratory and injunctive relief against the Defendants, requesting:

> [A] declaration that Defendants violated his clearly established rights as set forth in this First Amended Complaint; a declaration that the termination of Plaintiff's employment as a police officer with the TPD was unlawful; an injunction enjoining the enforcement of Defendant's unconstitutional acts, policies, practices, procedures, and/or customs that were the moving force behind the violation of Plaintiff's rights as set forth in this First Amended Complaint; an injunction expunging all paperwork or references from Plaintiff's personnel file related to the incident giving rise to Defendants' violation of his rights as set forth in this First Amended Complaint and prohibiting the use of any such paperwork or references in any future employment matter . . . .

Doc. 6, at ¶ 6. Plaintiff grounds this relief under 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure. *Id.* at ¶ 8.

To the extent Plaintiff is seeking declaratory and injunctive relief against Defendant Jordan in his official capacity, those claims are dismissed for the above stated reasons. Regarding Plaintiff's request for declaratory judgment against Defendant Jordan in his individual capacity and against Defendant City, the Declaratory Judgment Act ("DJA") provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not
> further relief is or could be sought. Any such declaration shall have the force and
> effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). Whether subject matter jurisdiction exists, there are "two separate hurdles

for parties seeking a declaratory judgment to overcome," a Constitutional one and a discretionary

one. *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008). First, there must be

an "actual controversy," which is "equated to the Constitution's case-or-controversy requirement."

*Id.* (citing *Aetna Life Ins. Co. v. Hayworth*, 300 U.S. 227, 239–40 (1937)). Second, since the DJA

is discretionary ("may," not "must"), a plaintiff must persuade the court to make a declaration on

the merits based on a number of case specific factors. *Id.* Relevant factors include whether a

declaratory judgment: (1) would settle the controversy; (2) would serve a useful purpose in

clarifying the legal relations at issue; (3) is being used merely for the purpose of procedural fencing

or to win the "race to res judicata"; (4) would increase friction between federal and state courts

and improperly encroach upon state jurisdiction; and (5) is in addition to an alternative remedy

which is better or more effective. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th

Cir. 1994).

Here, there is an "actual controversy," but the Court declines to exercise its jurisdiction

under the DJA. The Court has concluded as a matter of law that Defendant Jordan is entitled to

qualified immunity with respect to Plaintiff's constitutional claims and dismissed all federal claims

against Defendant City. Therefore, if the Court were to exercise its jurisdiction, it would not settle

the controversy or serve a useful purpose. Plaintiff's claim for declaratory relief against Defendant

Jordan in his individual capacity and against Defendant City is dismissed.

Concerning Plaintiff's request for injunctive relief (Doc. 6, at ¶ 6), the Court notes that Defendant Jordan is no longer the Chief of Police of TPD. *See* Doc. 21, at 6. Therefore, Defendant Jordan, individually, cannot provide Plaintiff with any of the relief he seeks. Concerning Defendant City, because the Court dismissed all the constitutional claims, an injunction in the manner requested by Plaintiff is likewise denied.

## IV.   *Burk* State Law Claim

Plaintiff lastly asserts a state law, wrongful discharge claim—a *Burk* claim[8]—against Defendants. Doc. 6, at ¶¶ 109–110. Plaintiff alleges the Defendants impermissibly infringed upon his freedom of speech or expression in violation of the First Amendment, the Oklahoma Constitution, and the City's policy. Doc, 6, at ¶ 109. Defendant City argues the claim must be dismissed because it is impermissibly vague, and Plaintiff is not entitled to double recovery. Doc. 13, at 22–24. Defendant Jordan argues this claim should be dismissed. Doc. 14, at 12–15. Plaintiff did not respond to Defendant Jordan's arguments. *See* Doc. 18. Therefore, the Court considers Plaintiff's *Burk* claim against Defendant Jordan abandoned and dismisses the claim without prejudice.

Regarding the *Burk* claim against Defendant City, since the Court has dismissed Plaintiff's federal claims, it is necessary to consider whether it is appropriate to decide the remaining state

---

[8] In *Burk v. K-Mart Corp.*, 770 P.2d 24, the Oklahoma Supreme Court created an exception to its general rule of at-will employment by recognizing a cause of action for wrongful discharge in violation of public policy. *Wilburn v. Mid-S. Health Dev., Inc.*, 343 F.3d 1274, 1277 n.2 (10th Cir. 2003). Generally, "employers are free to discharge at-will employees in good or bad faith, with or without cause," but the *Burk* tort allows an at-will employee to sue for wrongful discharge in violation of public policy. *Darrow v. Integris Health, Inc.*, 176 P.3d 1204, 1210 (Okla. 2008). To state a claim for wrongful discharge under the public policy exception to at-will employment, a plaintiff must allege:

> (1) An actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal.

*Vasek v. Bd. Of Cnty. Comm'rs of Noble Cnty.*, 186 P.3d 928, 932 (Okla. 2008).

law claim. Supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *City of Chicago v. Int'l. Coll. of Surgeons*, 522 U.S. 156, 172 (1997) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if the district court has dismissed all claims over which it has original jurisdiction. *See Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1165 (10th Cir. 2004) ("Even where a 'common nucleus of operative fact' exists, federal jurisdiction is not mandatory over pendant claims or parties."). When deciding whether to exercise supplemental jurisdiction, a federal court should consider and weigh in each case, and at every stage in the litigation, the values of "judicial economy, convenience, fairness, and comity." *Gibbs*, 383 U.S. at 726. If federal claims are dismissed before trial, leaving only issues of state law, "the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Bauchman for Bauchman v. West High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Gibbs*, 383 U.S. at 726).

Here, the Court has dismissed Plaintiff's federal claims. The case is still in its initial stages: a Scheduling Order has not been entered and the litigation has not progressed past the motion to dismiss stage. Therefore, it will not be unduly inconvenient for the parties to transfer to state court to try the *Burk* claim at this juncture. The *Burk* claim implicates Oklahoma public policy, and this Court finds it is more appropriate for an Oklahoma state court to adjudicate such a claim. For these reasons, the Court dismisses the *Burk* claim against Defendant City without prejudice.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant City of Tulsa's Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 13) is **GRANTED**. Plaintiff Wayne Brown's section

1983 claims (First Amendment and equal protection claims) against Defendant City of Tulsa are **DISMISSED WITH PREJUDICE**.

      **IT IS FURTHER ORDERED** that Defendant Charles W. Jordan's Motion to Dismiss Plaintiff's First Amended Complaint (Doc. 14) is **GRANTED**. Plaintiff Wayne Brown's section 1983 claims (First Amendment and equal protection claims), in his official and individual capacities, are **DISMISSED WITH PREJUDICE**.

      **IT IS FURTHER ORDERED** that Plaintiff Wayne Brown's state law *Burk* claim against Defendant City of Tulsa and Defendant Charles W. Jordan is **DISMISSED WITHOUT PREJUDICE**.

      **IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE